

# Office of the Attorney General
## State of Texas

**DAN MORALES**
ATTORNEY GENERAL

May 13, 1992

Mr. Ray Farabee
Vice Chancellor
The University of Texas
Office of General Counsel
201 West 7th Street
Austin, Texas 78701

Opinion No. DM-121

Re: Whether proposed drug testing policies submitted by the City of League City and the University of Texas are constitutional (RQ-115, RQ-260)

Honorable James F. Hury, Jr.
Chairman
Ways and Means Committee
Texas House of Representatives
P. O. Box 2910
Austin, Texas 78765-2910

Dear Gentlemen:

You have each submitted proposed drug testing policies. The policies submitted by Mr. Farabee, on behalf of the Board of Regents of the University of Texas System, would be applicable to certain applicants and employees of the University of Texas Health Center at Tyler and to faculty and resident physicians at the University of Texas Medical Branch at Galveston; the one submitted by Representative Hury would be applicable to employees of the City of League City. You ask about the constitutionality of the respective policies.

We note at the outset that attorney general opinions are addressed to specific legal questions. It is outside the scope of the opinion process to review the lengthy and detailed policies you have submitted. Also, with the exception of a portion of the League City policy, discussed below, that we believe to be constitutionally invalid as a matter of law, determinations in regard to the legality of the particular drug testing policies or their application will involve questions of fact. *See Harmon v. Thornburgh*, 878 F.2d 484, 490 n.9 (D.C. Cir. 1989), *cert. denied*, 110 S. Ct. 865 (1990) (noting that the "Supreme Court has quite clearly eschewed an approach to drug testing based on bright lines and clean analytic principles, and has instead mandated case-by-case balancing of individual and societal interests"). We cannot

resolve questions of fact in the opinion process. We will, therefore, generally limit this opinion to providing guidance by reference to applicable law. We will also address the questions you both raise about the validity of a prior opinion of this office on the legality of drug testing, Attorney General Opinion JM-1274 (1990).

The policies submitted provide for testing by urinalysis. Urinalysis compelled by the government is a search for purposes of the Fourth Amendment of the United States Constitution. *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665 (1989); *Skinner v. Railway Labor Executives Ass'n*, 489 U.S. 602, 617 (1989). A warrant or probable cause, however, is not necessarily required for employee drug testing. *Skinner*, 489 U.S. at 619. Rather, "where a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." *Von Raab*, 489 U.S. at 665-66.

Before a governmental body adopts an employee drug testing policy, it must first consider whether testing "serves special governmental needs, beyond the normal need for law enforcement." *Id.* at 665.[1] Assuming that it does, the governmental body must then determine whether its interests in testing its employees are sufficient to outweigh the privacy expectations of its employees. In making this determination, it must consider the nature of the employees' duties, taking into account that public employment alone is not a sufficient basis for mandatory drug testing. *Harmon*, 878 F.2d at 490. It must also consider the extent to which the testing will intrude upon the privacy interests of its employees. *Von Raab*, 489 U.S. at 665-66.[2] The governing board of a governmental body must make

---

[1] *See also Bluestein v. Skinner*, 908 F.2d 451, 455 (9th Cir. 1990), *cert. denied*, 111 S. Ct. 954 (1991) (assessing whether drug testing policy served special needs before balancing government's interests against the employees' privacy interests); *American Fed'n of Gov't Employees v. Skinner*, 885 F.2d 884, 889 (D.C. Cir. 1989), *cert. denied*, 110 S. Ct. 1960 (1990) (same); *National Fed'n of Fed. Employees v. Cheney*, 884 F.2d 603, 608 (D.C. Cir. 1989), *cert. denied*, 110 S. Ct. 864 (1990) (same).

[2] In making this determination, a governmental entity might want to consider, for example, the extent to which it will or will not be able to withhold test results and related information from general public disclosure. *See* Open Records Decision No. 594 (1991) (city employee drug testing ordinance provisions cannot operate to exempt drug testing information from required public disclosure under the Texas Open Records Act, V.T.C.S. article 6252-17a).

those determinations in the first instance, subject to court review in the event its policy is challenged.

As the United States Court of Appeals for the District of Columbia has noted, however, public employment alone is "not a sufficient predicate for mandatory urinalysis." *Harmon*, 878 F.2d at 490; *see also National Fed'n of Fed. Employees v. Cheney*, 884 F.2d 603, 613 (D.C. Cir. 1989), *cert. denied*, 110 S. Ct. 864 (1990). A "clear, direct nexus [must exist] between the nature of the employee's duty and the nature of the feared violation." *Harmon*, 878 F.2d at 490 (citing *Von Raab*). In *Von Raab*, for example, a case in which the Supreme Court upheld drug testing of customs service employees seeking promotions to positions directly involving the interdiction of illegal drugs or requiring the incumbent to carry a firearm, there was a clear nexus between the employees' prospective duties and the risk that "they might endanger the integrity of our Nation's borders or the life of the citizenry." *Von Raab*, 489 U.S. at 679.[3]

We turn now to the particular policies at issue here. Representative Hury submits the proposed drug testing policy of the City of League City (hereinafter the "city policy") and states that the city "is concerned about the effects of Attorney General Opinion JM-1274 on the implementation of such a policy." Attorney General Opinion JM-1274, which we will discuss more fully below, concluded that a sheriff department's "random drug testing" of deputy sheriffs and jailers by urinalysis would violate constitutional privacy protections where no compelling governmental objectives, or "specific demonstrable goals," were shown that could not "be achieved by less intrusive, more reasonable means." Attorney General Opinion JM-1274 at 4. We understand Representative Hury's request, therefore, to put at issue the "random" testing provisions of the city policy.

---

[3]*See also National Treasury Employees Union v. Yeutter*, 918 F.2d 968, 977 (D.C. Cir. 1990) (government's interest in ensuring safety justified random urinalysis drug testing of agency motor vehicle operators); *Bluestein*, 908 F.2d at 456 (upholding random drug testing of airline employees because government had a sufficient interest in preventing drug use by persons holding safety-sensitive positions in the aviation industry); *Taylor v. O'Grady*, 888 F.2d 1189, 1198 (7th Cir. 1989) (corrections department's interests in avoiding dangers of drug impaired work force and drug smuggling justified compelling annual urinalysis of employees who came into regular contact with prisoners); *Kemp v. Claiborne County Hosp.*, 763 F. Supp. 1362, 1369 (S.D. Miss. 1991) (hospital's interest in ensuring safety of patients justified mandatory drug testing of employee involved in hands-on patient care). *See generally* Haas, *The Supreme Court Enters the "Jar Wars": Drug Testing, Public Employees, and the Fourth Amendment*, 94 DICK. L. REV. 305 (1990).

Article IV, section 4.01 of the city policy provides that "[t]he City's Director of Administrative Services may require that a test for the presence of drugs be conducted . . . on a random . . . basis." Article X, section 10.01 makes a similar provision with respect to city employees generally, and article X, section 10.02 provides that "[e]mployees in safety sensitive jobs may be subject to random . . . drug testing on a routine basis, as determined by the Director of Administrative Services."

We think a court would find that the city policy's provisions for random testing of *all* city employees, as a matter of law, run afoul of Fourth Amendment protections against unreasonable searches. As discussed above, the federal courts have indicated that public employment alone is not a sufficient predicate for testing not based on individualized suspicion, but that a sufficient nexus must exist between the particular employee's duties and the feared consequences of the employee's use of drugs. *See Von Raab*, 489 U.S. 656; *Harmon*, 878 F.2d 484; *National Federation of Federal Employees*, 884 F.2d 603. Determination, on the other hand, of the constitutionality of the city policy's provisions for random testing of employees in "safety sensitive" positions would, we think, require a full fact-finding with regard to factors relevant to a constitutional balancing test, such as the nature of those "safety sensitive" positions and the city's interest in testing those employed in such positions, and those employees' "privacy expectations."

The proposed drug testing policy of the University of Texas Health Science Center at Tyler (hereinafter the "center policy") provides for the testing of those applying for or employed in certain "safety sensitive" and "health care positions" -- to wit, those whose duties involve 1) "the diagnosis, treatment, or care of patients"; 2) "the operation of equipment or the performance of a test or analysis that is utilized in the diagnosis and treatment of patients"; 3) "access to controlled substances"; 4) "access to cash"; or 5) "the lawful use or possession of a firearm." Under the center policy, testing may be required of employees in the above categories after they have been involved in certain on-the-job accidents, observed possessing or using alcohol or illegal drugs on the job, or observed by a supervisor trained in such matters as exhibiting on the job the appearance or behavior of one under the influence of illegal drugs or alcohol. Also, the above categories of employees, except those having "access to cash," may be tested on a random basis to be "determined by the University." All applicants tentatively accepted for employment in the above categories are to be tested as a condition of employment. Center policy §§ I - III.

The University of Texas System also asks about the legality of pre-employment drug testing for faculty and resident physicians whom the University of Texas Medical Branch at Galveston (hereinafter "UTMBG") requires to perform medical work at the Shriners Burns Institute of Galveston (hereinafter "SBI"). SBI, a private entity providing care to severely burned children, has adopted a policy providing for drug testing new employees including the UTMBG faculty and resident physicians working at SBI. Under these circumstances, it is clear that UTMBG's requiring faculty and resident physicians to work at SBI would constitute government-compelled testing and would therefore be subject to constitutional protections. Thus, in answer to your question regarding the SBI policy, it would not be legally permissible for UTMBG to require assignments and rotations in SBI unless SBI's policy passes constitutional muster.

We note first that on the facts presented in *Von Raab*, the court upheld testing of certain customs service employees applying for transfer to positions whose duties involved the carrying of firearms or access to controlled substances. *National Federation of Federal Employees* upheld random testing of Army civilian police and guards carrying firearms. Both these courts reached their decisions, however, only after considering a variety of other fact-bound matters such as the employees' expectations of privacy or whether the employees' duties were carried out in traditional office environments where they could be monitored in a more routine manner.

More pertinent to the testing of medical personnel, *Kemp v. Claiborne County Hosp.*, 763 F. Supp. 1362 (S.D. Miss. 1991), upheld mandatory testing of a scrub technician whose duties involved "hands-on" patient care, including being present and assisting during surgery. The court ventured to say that "any hospital employee who is involved in direct, hands-on patient care occupies a safety sensitive position" such that the government has a strong interest in guarding against such employees being drug-impaired. 763 F. Supp. at 1368. The *Kemp* court again, however, considered various other factual circumstances before concluding that the testing in that case was constitutionally permissible, for example, that the employee in question had a diminished expectation of privacy because she had undergone routine physicals involving blood-testing and urinalysis as a condition of employment and because she had received prior notice of the drug testing at issue and signed a consent form. Accordingly, although certain of the categories of employees made subject to testing under the University of Texas System policies have been held to be constitutional by courts in other contexts, we think that determination of the appropriateness of the categories established by these policies

would require fact-findings specific to conditions at the University of Texas Health Center at Tyler, UTMBG, and SBI.

Similarly, although it seems likely that applicant testing, as opposed to employee testing, would be given somewhat greater rein by the courts, we are unable to conclude here that the applicant testing provisions of the center policy, or the pre-employment testing policies of SBI to which UTMBG faculty and residents are subject, would withstand constitutional scrutiny as a matter of law. We believe that a court would consider a range of essentially fact-bound matters, similar to those factors discussed above with respect to employee testing, before reaching a conclusion. *See Von Raab* (testing of customs service employees applying for transfer to certain job categories); Haas, *The Supreme Court Enters the "Jar Wars": Drug Testing, Public Employees, and the Fourth Amendment*, 94 DICK. L. REV. 305, 341-42 (1990).

Finally, we turn to the question of the viability of Attorney General Opinion JM-1274. In Attorney General Opinion JM-1274, this office concluded that a sheriff's department's "random drug testing"[4] of deputy sheriffs and jailers by urinalysis would violate privacy protections under the Texas Constitution. The opinion based its conclusion on *Texas State Employees Union v. Texas Dep't of Mental Health & Mental Retardation*, 746 S.W.2d 203 (Tex. 1987) (hereinafter *"TSEU"*), a case in which the Texas Supreme Court held that a state agency's policy of subjecting its employees to polygraph examinations violated privacy protections under the state constitution. Under *TSEU*, to pass constitutional muster a governmental body must demonstrate that 1) the intrusion is warranted to achieve a compelling governmental objective; and 2) that objective cannot be achieved by less intrusive, more reasonable means. Attorney General Opinion JM-1274 concluded that a drug testing policy will not pass constitutional muster where the government has shown no governmental objective to justify the intrusion into the privacy of its employees.

We believe that Attorney General Opinion JM-1274 correctly concluded that the Texas Supreme Court would hold that the collection and testing of urine implicates privacy interests protected by the Texas Constitution. Although no Texas

[4]The University of Texas System has expressed concern as to the meaning of "random drug testing" as discussed in Attorney General Opinion JM-1274 at 1. To clarify, a pre-employment or employee policy that subjects all applicants for or employees in specific positions to drug testing procedures without exception would not be considered a "random" policy.

court has addressed the constitutionality of a drug testing policy in a reported opinion, we believe there is a strong likelihood that Texas courts will construe the state constitution to place broader limitations on drug testing of public employees than does the federal constitution. *See Heitman v. Texas*, 815 S.W.2d 681 (Tex. Crim. App. 1991) (suggesting that the protections of article I, section 9 of the Texas Constitution may exceed those in the Fourth Amendment of the United States Constitution); *State of Texas v. Morales*, No. 3-91-195-CV (Tex. App.--Austin, March 11, 1992, n.w.h.) (applying state constitutional privacy test from *TSEU* in striking down state statute criminalizing certain consensual adult sexual behavior).

Both requestors here have stated what they believe to be the governmental objectives justifying the drug testing policies at issue.[5]   We do not opine as to whether such objectives might be achieved by less intrusive means, as such a determination necessarily involves resolution of facts. The governing boards that intend to implement these policies, or the board of any governmental body implementing a drug testing policy, should examine their respective policies in view of both the federal and state constitutional standards discussed in this opinion. This office recommends that any governmental body that implements a drug testing policy make findings to support the conclusion that its governmental objectives cannot be achieved by less intrusive means, bearing in mind that decisions regarding the constitutionality of all drug testing policies may be challenged in court.

---

[5]The League City policy states that it is "designed to eliminate the use of drugs and alcohol and their effects in the workplace, so as to better provide for the general health and safety of its employees." City Policy § 1.01. The University of Texas Health Center at Texas states that its interest in testing certain categories of employees arises from the "extraordinary safety hazard" posed by a "drug impaired employee," the danger of "impairment" of the "hospital's integrity and the risk of property loss."

## S U M M A R Y

The determination whether a particular drug testing policy is constitutional involves questions of fact and is therefore beyond the scope of an attorney general opinion. The governing board of a governmental body must make those determinations in the first instance, subject to court review in the event the policy is challenged.

Very truly yours,

DAN MORALES
Attorney General of Texas

WILL PRYOR
First Assistant Attorney General

MARY KELLER
Deputy Assistant Attorney General

RENEA HICKS
Special Assistant Attorney General

MADELEINE B. JOHNSON
Chair, Opinion Committee

Prepared by Madeleine B. Johnson
Assistant Attorney General