**Maria PIROGLU, Appellant,**

v.

**T.R. COLEMAN, Individually and as Fire Chief, District of Columbia, et al., Appellees.**

**No. 92–7161.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 7, 1994.

Decided June 17, 1994.

Craig Becker, San Francisco, argued the cause for the appellant. On brief were John C. Dempsey and Arthur B. Spitzer, Washington, DC.

Michael A. Conley, Sp. Asst. Corp. Counsel, Washington, DC, argued the cause for the appellees. On brief were John Payton, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, DC.

Before SILBERMAN, SENTELLE and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

Maria Piroglu brought suit in district court against the District of Columbia, its then-Fire Chief T.R. Coleman, Fire Department Lead Inspector Roger Hooper and Police Sergeant Nora Coxeum (referred to collectively as the District), alleging violations of her fourth and fifth amendment rights. Specifically, Piroglu asserted that the mandatory urinalysis to which the District subjected her constituted an unreasonable search under the fourth amendment because: (1) Sergeant Coxeum visually observed as she produced her urine sample; and (2) the testing was conducted in the absence of regulations limiting the District's discretion to order unannounced urinalysis. She further alleged that

the District violated her fifth amendment right to due process when it terminated her employment on the basis of a positive drug test without providing her notice and an opportunity to be heard. Piroglu appeals the district court's grant of summary judgment to the District.

## I.

Piroglu began her employment with the District on July 7, 1986, as an emergency medical technician (EMT) and was immediately enrolled in a four week mandatory training course. From the outset, the District notified Piroglu and her fellow EMT trainees that they would be tested for illegal drug use. Joint Appendix (J.A.) at 47, 61. The District did not, however, let the trainees know when the testing was to take place. Near the end of the training course, EMT Training Instructor Roger Hooper informed the trainees that their drug tests were scheduled later that day. They were then taken as a group to the Police and Fire Clinic (the clinic) for the tests.

Once at the clinic, Piroglu was instructed to urinate into a bottle in the presence of Coxeum. It is unclear from the record before us the circumstances under which Piroglu provided her urine sample. Piroglu implies that Coxeum observed her urine as it passed from her body into the bottle. Piroglu's Brief at 5 ("Coxeum observed Plaintiff as she urinated into a bottle."). The District asserts that although Coxeum watched Piroglu continuously as Piroglu provided the sample, she did not actually watch Piroglu's urine pass into the specimen bottle. J.A. at 107–08. At any rate, when Piroglu handed the filled specimen bottle to Coxeum, Coxeum observed that the sample felt cold. Believing that Piroglu had tampered with her sample, she called in another clinic employee and the two observed Piroglu as a second sample was produced.

The clinic tested Piroglu's second urine sample using the enzyme-multiplied immunoassay technique (EMIT). According to the record, EMIT is 95 to 96 per cent accurate in determining the presence of controlled substances in urine. J.A. at 94. Piroglu's sample tested positive for cocaine me-

tabolites. The clinic then sent the specimen to CompuChem Laboratories, where it was tested again, this time using the gas chromatography/mass spectrometry (GC/MS) method. When used in combination with EMIT, the GC/MS method is 99.9 per cent accurate. *Id.* The CompuChem test also yielded a positive result. Piroglu has never challenged the accuracy of the test results.

Piroglu was not permitted to complete the one-year probationary period required of EMT trainees because of her positive drug test results. On August 20, 1986, Chief Coleman notified Piroglu by letter that her employment was terminated for failure to complete successfully her probationary period. On March 4, 1987, Piroglu brought suit against the District alleging violations of her fourth and fifth amendment rights. Both Piroglu and the District moved for summary judgment. After the parties had briefed and argued their motions, the Supreme Court granted certiorari in two unrelated cases involving fourth amendment challenges to mandatory drug testing procedures. *See Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), *rev'g Railway Labor Executives' Ass'n v. Burnley,* 839 F.2d 575 (9th Cir. 1988); *National Treasury Employees' Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), *aff'g in part and vacating in part* 816 F.2d 170 (5th Cir.1987). The District moved to stay Piroglu's action pending the Supreme Court's disposition of the two cases. The district court granted the District's motion to stay over Piroglu's objection.

After the Supreme Court decided *Skinner* and *Von Raab,* the parties rebriefed their cross-motions for summary judgment. The district court then, for reasons not explained in the record, held the case under advisement for three years. During that time, we decided *National Treasury Employees' Union v. Yeutter,* 918 F.2d 968 (D.C.Cir.1990). In *Yeutter,* we held that in the absence of a particularized reasonable suspicion of tampering, an employer's visual observation of its employee's act of urination may render the employer's drug testing unreasonable under the fourth amendment. *Id.* at 975–77.

The district court granted the District's motion for summary judgment on April 29, 1992. Because the district court's order did not discuss *Yeutter*, Piroglu filed a motion requesting the court to reconsider the effect of *Yeutter* on her fourth amendment claims. On July 17, 1992, the district court denied Piroglu's motion for reconsideration.

## II.

The District's collection of Piroglu's urine sample constitutes a search subject to the fourth amendment's requirement of reasonableness. *See National Treasury Employees' Union v. Von Raab*, 489 U.S. 656, 665, 109 S.Ct. 1384, 1390–91, 103 L.Ed.2d 685 (1989); *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 618, 109 S.Ct. 1402, 1413–14, 103 L.Ed.2d 639 (1989). Piroglu argues that the District's collection of her urine sample was unreasonable because: (1) a District official observed her as she urinated without any reason to believe that she would tamper with her urine sample; and (2) the testing was an act of unbridled discretion. We address Piroglu's arguments in turn.

### A.

■ In order to determine whether the District's visual observation of Piroglu as she provided her urine sample violated the fourth amendment, we must balance the District's interest in observation with the resulting intrusion on Piroglu's interest in privacy. *National Treasury Employees' Union v. Yeutter*, 918 F.2d 968, 975–76 (D.C.Cir.1990). On the record before us, we are unable to perform the balancing test called for by *Yeutter*. The record does not resolve the parties' dispute regarding whether Coxeum had Piroglu in plain sight as Piroglu urinated or whether she was merely present and observed Piroglu in some less intrusive way while the sample was provided. For example, the record does not foreclose the possibility that Piroglu was in a stall when she urinated and Coxeum merely observed her feet under the door.[1]

Without conclusive evidence as to the precise circumstances of the urine collection, it is impossible for us to assess the degree to which the District may have invaded Piroglu's privacy. With Coxeum's vantage point (a critical point) in dispute, the district court erred in granting summary judgment to the District on Piroglu's claim that its visual observation rendered the testing procedure unreasonable under the fourth amendment. Accordingly, we remand to the district court so that it may resolve the issue based on a more thorough development of the factual record.

Nevertheless, we offer some guidance to the district court in its analysis of Piroglu's claim that the District's visual observation of her rendered the testing unconstitutional. In denying Piroglu's motion for rehearing the district court declined to consider our decision in *Yeutter* because the case "did not purport to operate retroactively to invalidate urine-testing of particular specimens acquired earlier." J.A. at 183–84. We disagree with the district court's analysis. We decided *Yeutter* in November, 1990, well in advance of the district court's grant of summary judgment on April 29, 1992. Accordingly, the district court's decision not to apply *Yeutter* in a case pending at the time *Yeutter* was decided was incorrect. *See Harper v. Virginia Dep't of Transp.*, —— U.S. ——, ——, 113 S.Ct. 2510, 2516, 125 L.Ed.2d 74 (1993) ("Nothing in the Constitution alters the fundamental rule of retrospective operation that has governed [j]udicial decisions ... for near a thousand years.") (internal quotation omitted).

■ If the district court finds that Coxeum's observation of Piroglu as Piroglu urinated was unobstructed and complete and was without reasonable suspicion that she would tamper with her sample, the collection of Piroglu's first urine sample was unreasonable under the fourth amendment. *See Yeutter*, 918 F.2d at 975. If, on the other hand, the court finds that Coxeum did not have Piroglu in plain sight as Piroglu urinated, the

---

1. The district court's Memorandum and Order is unclear on this issue. *See* J.A. at 179 ("The EMT candidates were allowed to void in private, observed only by a single superior of the same sex...."). If one is totally observed as he urinates, it can hardly be said that he is "allowed to void in private."

collection of Piroglu's first sample would be reasonable. After Coxeum observed that Piroglu's sample felt cool she would have had a reasonable suspicion that Piroglu had tampered with the sample and thus her observation of Piroglu as Piroglu provided the second sample would not violate the fourth amendment. Nevertheless, the district court would still have to address Piroglu's argument that visual observation by *two* clinic employees was unreasonable. Although we do not pass on the question whether the mere presence of two clinic employees would automatically render the testing unreasonable, the District should explain why it thought two observers were necessary.

Finally, we address the remedy available to Piroglu if the district court finds that her testing was unreasonable. Piroglu seeks reinstatement and back pay as well as compensatory and punitive damages. *See* J.A. at 27. Even if the court determines that Coxeum's visual observation of Piroglu as Piroglu urinated was unreasonable, an award of reinstatement and back pay would be inappropriate. As noted earlier, Piroglu's first sample was never tested. Accordingly, any constitutional infirmity in the collection of the first sample in no way led to Piroglu's termination. If the court concludes that the collection of her second sample was similarly tainted, reinstatement and back pay would nevertheless be unavailable remedies because the constitutional violation did not *cause* Piroglu's discharge. *See Carey v. Piphus,* 435 U.S. 247, 254–59, 98 S.Ct. 1042, 1047–50, 55 L.Ed.2d 252 (1978). The District terminated Piroglu's employment because she tested positive for cocaine use irrespective of any constitutional infirmity in the collection process. Therefore, Piroglu's remedy would be one for damages only. *See generally Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 397, 91 S.Ct. 1999, 2005, 29 L.Ed.2d 619 (1971) ("[P]etitioner is entitled to recover

money damages for any injuries he has suffered as a result of the agents' violation of the [Fourth] Amendment.").

## B.

▮ Piroglu also argues that the District's drug testing was unreasonable because it was an exercise of unbridled discretion. Specifically, Piroglu contends that because District regulations did not specify that she could be tested randomly, the District was required to obtain a warrant before testing her.[2] As the Supreme Court has explained, an employer need not obtain a warrant before testing its employees "when special needs, beyond the normal need for law enforcement, make the warrant and probable cause requirement impracticable." *See, Skinner,* 489 U.S. at 619, 109 S.Ct. at 1414. The District's testing of its EMT trainees serves a special need wholly unrelated to law enforcement: it ensures that individuals charged with protecting the public health and safety are not under the influence of drugs. To determine whether the District's special need in testing its EMT trainees renders the warrant requirement impracticable, we "balance the governmental and privacy interests to assess the practicality of the warrant and probable cause requirements in the particular context." *Id.*

The District has a strong interest in testing its EMT trainees for drug use. Once the trainees become EMTs they are called upon to assess an emergency patient's symptoms, to administer cardiopulmonary resuscitation and to transport the emergency patient to a health care facility. *See generally District of Columbia v. Howard,* 588 A.2d 683 (D.C. 1991). Given the nature of his duties, an EMT under the influence of drugs poses a real and substantial risk to public health and safety. The District's ability to protect the public through preventive drug screening of

---

**2.** The District Fire Department regulations in effect at the time of Piroglu's test authorized drug testing when

> a member of the Department clearly exhibits erratic behavior consistent with intoxication, giving the on-duty platoon commander probable cause to believe that the man is under the influence of ... drugs to the extent that his

> physical and mental facilities are affected and his judgment is impaired.

*Fire Department Order Book* art. 7, § 7. Although the District argues that its substance abuse policy did allow random testing of its EMT trainees, it appears from the record that, at the time of Piroglu's test, the policy was not yet in effect. *See* J.A. at 72.

its EMT trainees would be greatly frustrated if it first had to obtain a warrant; a trainee who uses drugs could complete the training program without exhibiting symptoms of probable drug use only to become an EMT and pose a significant·danger to the public safety. *See Skinner,* 489 U.S. at 631, 109 S.Ct. at 1420 ("A requirement of particularized suspicion of drug·or alcohol use would seriously impede an employer's ability to obtain this information, despite its obvious importance.").

Balanced against the District's strong interest in testing trainees without a warrant, the invasion of Piroglu's privacy resulting from a warrantless drug test is relatively slight. Piroglu was informed at the beginning of the probationary period that she would be tested for drug use at some point during her training. J.A. at 47. Although advance notice of drug testing does not automatically defeat an employee's argument that the testing is unconstitutional, it does decrease his expectation of privacy. *See Willner v. Thornburgh,* 928 F.2d 1185, 1189–90 (D.C.Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 669, 116 L.Ed.2d 760 (1991). Moreover, as part of its EMT training program, the District required all trainees to.submit to physical examinations, including a drug test. *See* J.A. at 56. Piroglu herself had already been tested once before the challenged drug test took place. *See id.* On this record, Piroglu's privacy interest in being free from a warrantless drug test is insubstantial. Because the District's interest in randomly testing its trainees outweighs Piroglu's privacy interest, we reject her argument that the fourth amendment required the District to obtain a warrant before testing her.

Piroglu next argues that the drug test was unreasonable because the District did not have regulations in place delimiting its discretion in testing its trainees. Specifically, Piroglu asserts that the decision to subject her to random drug testing was an exercise of unrestricted discretion on the part of EMT Training Instructor Hooper because no regulation authorized the testing of EMT trainees in the absence of individualized suspicion. Piroglu relies primarily on the Supreme

Court's decision in *Skinner.* In that case, the Court's holding that the employer was not required to obtain a warrant before subjecting its employees to urinalysis was based, in part, on its conclusion that the warrant requirement would "do little" to protect the employees' privacy because "[b]oth the circumstances justifying toxicology testing and the permissible limits of such intrusions are defined narrowly and specifically in the regulations that authorize them, and doubtless are well known to covered employees." *Skinner,* 489 U.S. at 622, 109 S.Ct. at 1416. Piroglu reads *Skinner* to establish an absolute requirement that employee urinalysis be conducted only pursuant to regulations. We disagree. The Court did not hold that urinalysis constitutes an unreasonable search if conducted in the absence of regulations. Rather, it held that, when weighing an employee's privacy interest against an employer's interest in random drug testing, the existence of specific authorizing regulations decreases the employee's privacy interest. *Id.* at 621–24, 109 S.Ct. at 1415–17.

The absence of regulations governing the District's testing of Piroglu does not alter our conclusion that the District's interest in testing its EMT trainees without a warrant outweighs Piroglu's privacy interest. Piroglu's privacy interest was not adversely affected by Hooper's decision to test her and her fellow EMT trainees as part of their training program—as noted earlier, Piroglu and the other trainees were informed from the outset that they would be subject to drug testing during their training period. J.A. at 47, 61. A regulation expressly authorizing the drug testing of EMT trainees would not have provided Piroglu with notice she did not otherwise receive. The District apparently had in the past subjected *all* EMT trainees to unannounced drug testing at some time during their training. *See* J.A. at 72 ("Other classes of EMTs, which preceded plaintiff's class, were uniformly tested for drug use immediately prior to their completion of training."). Indeed, Piroglu concedes that she had been told that she "might be subject to drug testing during her employment." Piroglu's Brief at 4.[3] Moreover, the District's

---

3. Piroglu claims that the District did not have a

uniform practice of testing each of its EMT train-

uniform practice restricted its discretion to order drug testing. The practice authorized Hooper to order his EMT trainees to submit to unannounced drug testing; it would not, however, have authorized him to single Piroglu out in the absence of individualized suspicion and subject only her to an unannounced test. Because Piroglu had notice that she was subject to unannounced drug testing and because the District's uniform practice sufficiently delineated its authority, its testing of Piroglu was not unreasonable under the fourth amendment.

### C.

 Finally, Piroglu challenges the district court's grant of summary judgment on her fifth amendment claim, asserting that the District denied her due process when it terminated her employment without providing notice of the evidence against her and an opportunity to be heard. The legitimacy of Piroglu's argument turns on whether she had a property interest in continued employment. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 546, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985). To establish a property interest, Piroglu must show more than a unilateral expectation that her employment would not be terminated. *See Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann,* 408 U.S. 593, 602–03, 92 S.Ct. 2694, 2700–01, 33 L.Ed.2d 570 (1972). She must show "a legitimate expectation, based on rules (statutes or regulations) or understandings (contracts, express or implied), that [s]he would continue in [her] job." *Hall v. Ford,* 856 F.2d 255, 265 (D.C.Cir.1988).

Piroglu's status as a probationary employee is a large hurdle for her to clear in order to establish a property interest. Probationary employment is ordinarily considered employment at will. *See Wheaton v. Webb-Petett,* 931 F.2d 613, 619 (9th Cir.1991) ("Typically, permanent and classified employees have been held to have property interests

... while probationary and nonclassified employees have not."); *Duke v. Langdon,* 701 F.2d 768 (9th Cir.1983) (probationary employee had "no legitimate claim of entitlement to continued employment") (internal quotation omitted); *Ring v. Schlesinger,* 502 F.2d 479, 486 (D.C.Cir.1974) (probationary employee did not have "an expectancy of job retention requiring procedural protection under the due process clause."). As we have previously held, "[t]hose who are terminable at will have no property interest because there is no objective basis for believing that they will continue to be employed indefinitely." *Hall v. Ford,* 856 F.2d 255, 265 (D.C.Cir.1988).

Piroglu relies on a District regulation relating to the separation of a probationer as the source of her entitlement to continued employment with the District. *See* J.A. at 115–16 (District Personnel Manual, Ch. 8, Subpart 6.3(H)(1)). The regulation provides that a probationary employee may be terminated before completing his probationary period if he "fails to demonstrate that he ... possesses the skill and character traits necessary for satisfactory performance." *Id.* Piroglu argues that the regulation entitles her to continued employment by restricting the circumstances under which the District can terminate her employment. The district court disagreed, interpreting the regulation to provide for "the discretionary and unreviewable termination of probationary employees during the probationary period." J.A. at 181. We agree with the district court.

Although Piroglu asserts that under the regulation the District can terminate her employment *only* if it determines that she lacks necessary skill and character traits, the word "only" does not appear in the regulation's text. The regulation merely sets out certain circumstances in which a probationary employee may be terminated; it does not limit the District's discretionary right to otherwise terminate him. *But see Lewis v. Hayes,* 152 Ill.App.3d 1020, 106 Ill.Dec. 102, 105, 505 N.E.2d 408, 411 (1987) ("The defendants ar-

ees. *See* Piroglu's Reply Brief at 1 n. 1. She did not, however, produce any evidence that the District has permitted a trainee to graduate without passing a drug test. Piroglu's bare assertion that no drug testing practice existed is insufficient to

create a genuine issue of material fact rendering summary judgment inappropriate. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

gue that because [the regulation] does not contain the word 'only' that it is just an additional way to discharge a probationary employee. We would only say that to accept the defendants' interpretation of its rule would render it meaningless."). Our interpretation is supported by D.C.Code § 1–617.1, which provides that a permanent employee "who is not serving a probationary period" may be terminated only for cause. Section 1–617.1 manifests that a probationary employee enjoys no entitlement to continued employment.[4]

Piroglu's reliance on decisions from other jurisdictions holding that a probationary employee can have a property interest in continued employment is misplaced. *See, e.g., Lee v. Western Reserve Psychiatric Habilitation Ctr.*, 747 F.2d 1062, 1067 (6th Cir.1984); *Perri v. Aytch*, 724 F.2d 362, 365 (3d Cir.1983). In both *Lee* and *Perri*, the regulations at issue restricted the agencies' discretion by providing that probationary employees could be terminated *only* in certain circumstances. *See Lee*, 747 F.2d at 1067 ("The defendants concede, however, that the plaintiff had a property interest in his employment under [the regulation], which provides that an employee in the classified service cannot be removed except for the reasons stated therein."); *Perri*, 724 F.2d at 365 ("Although probationary employment is commonly at the will of the employer, in this instance the regulations ... specifically provided that dismissal during the probationary period shall be 'for just cause only.' "). These cases are not persuasive because the District's regulations do not contain similar words of exclusivity. Because Piroglu had no property right in continued employment, we affirm the district court's grant of summary judgment to the District on Piroglu's fifth amendment claim.

For the foregoing reasons, we reverse the district court's grant of summary judgment on Piroglu's claim that the District's visual observation of her rendered her drug test unreasonable under the fourth amendment and remand so that the district court may determine the precise circumstances of Piroglu's drug test. We urge the district court to decide the matter with dispatch in light of the fact that Piroglu's complaint has been pending since 1987—over six years. We affirm the district court in all other respects.

*So ordered.*

---

4. Piroglu's reliance on the Fire Department rules is similarly unavailing. They provide, in relevant part, that "service of a probationer may be terminated by the Commissioner at any time during such year for misconduct, inefficiency, or unfitness." *Rules and Regulations of the Fire Department of the District of Columbia* art. XII, pt. A, § 3 (*reprinted* in J.A. at 132). Again, we find the District's discretion to terminate a probationary employee unaffected by the Fire Department rule.