No. 20,329.

THE PUBLIC UTILITIES COMMISSION OF THE STATE OF
COLORADO *v.* STANTON TRANSPORTATION COMPANY, ET AL.
(386 P. [2d] 590)

Decided November 4, 1963.    Rehearing denied November 26, 1963.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mr. JOHN J. CONWAY, Assistant, for plaintiff in error.

Mr. JOHN P. THOMPSON, Amicus Curiae.

Messrs. MEIKLEJOHN, KILROY & KEHL, Mr. EDWARD T. LYONS, JR., for defendant in error Stanton Transportation Company.

*En Banc.*

MR. JUSTICE PRINGLE delivered the opinion of the Court.

THE plaintiff in error, the Public Utilities Commission of the State of Colorado, will be referred to as the Commission, the defendant in error, Stanton Transportation Company, will be referred to as Stanton or transferor, and defendant in error, Kerr Truck Company, will be referred to as Kerr or transferee.

The action involves an application to the Commission for the transfer of a private carrier permit from Stanton to Kerr. After a hearing the application was granted subject to the restriction that the transferee maintain its operational headquarters and office in Craig, Colorado. Upon application of Stanton and Kerr a writ of certiorari was issued from the District Court of Moffat County pursuant to C.R.S. '53, 115-6-15. The district court modified the decision of the Commission by striking the restriction referred to.

The permit in question was a private carrier authority containing no express limitations as to the territory in which it could be operated or as to the commodities which could be transported under it. It was originally issued to Joseph J. Stanton of Craig, Colorado, in 1931. It was renewed from time to time and in 1940 was transferred to Walter Utzinger, doing business as J. J. Stan-

ton Transportation Company. In 1951 Utzinger was authorized by the Commission to transfer the authority to Stanton Transportation Company, a Colorado corporation.

The testimony elicited at the hearing before the Commission established that Stanton's base of operations and office since the issuance of the permit had always been in Craig, Colorado, and that every shipment undertaken by Stanton under the permit in question had either begun or ended in Craig or in the surrounding territory.

W. M. Kerr, holder of 51% of the stock of the transferee, testified on cross examination that he personally had charge of Kerr's operations and that if Kerr acquired Stanton's permit it intended to develop transportation out of Denver to points such as Sterling, Granby, and Grand Junction, Colorado, and that it would "try to *activate* the permit in all of its authority." (Emphasis supplied.) Kerr is an ore hauler operating out of Cameo, Colorado, which is near Grand Junction and considerably removed from Craig, and proposed to establish and maintain its headquarters in Cameo.

Witnesses for common carriers serving the Grand Junction area and other parts of the state testified as protestants at the hearing. The substance of their testimony was that Stanton had never operated in their area and that if Kerr were permitted to operate under the permit with a base of operations in their area and in competition with them, they would suffer severe economic loss.

On this state of the record, the Commission determined that the permit in question had always been operated with headquarters exclusively in Craig and had always been centered in the Craig area; that other operations in other parts of the state had been isolated transactions of an occasional nature and incidental to the operations of Stanton under its private carrier permit; that transfer of the permit should not be effected so as to deprive customers of service to which they are entitled or to

disrupt or distort existing motor transportation relationships in the state; that there are several common carriers operating in the area encompassed by the economic sphere in the vicinity of Cameo who adequately serve the territory and no showing of any private need or demand for a private carrier in that area had been made out; that the transfer of the authority, so as to permit the removal of the operations from the Craig area to the Cameo area, would be tantamount to granting new authority in the Cameo area and would seriously distort the existing transportation system in the state; and that the transfer restricting the operation of the permit to headquarters in Craig would constitute a transfer of the authority exactly as it had been operated from the time of its inception and would neither diminish nor enlarge the authority.

The Commission also found that the training, experience, ability and financial responsibility of the transferee had been established to its satisfaction.

The only real issue presented is whether the Commission, upon an application to transfer a private carrier permit is limited, as Stanton and Kerr contend, to the function of satisfying itself *only* as to the financial fitness of the transferee, or whether it may, as it contends here, impose in the public interest *reasonable* restrictions not inconsistent with past operations upon how the permit shall be operated by the transferee.

In determining this question, it becomes necessary to examine briefly the background and history of private and common carrier legislation in this state and the purposes sought to be achieved by such legislation. From 1913 to 1927 all common carriers were regulated under the general public utilities law. In 1927 a special act (now C.R.S. '53, 115-9) was enacted for the regulation of motor vehicle carriers, but this Court, in *Burbridge v. PUC*, 91 Colo. 134, 12 P. (2d) 1115, held that the 1927 act did not encompass private carriers. Private carriers, therefore, remained outside the scope of regulation. They

enjoyed free and unlimited use of the highways and operated wherever they wished. They were able to select only profitable business and reject unprofitable business, while the common carrier was required to accept all business. Under these circumstances, it soon became apparent that to protect the public interest in the survival of common carrier service, it was necessary that some kind of regulation be imposed upon private carriers. *McKay v. PUC*, 104 Colo. 402, 91 P. (2d) 965. Thereupon, the 1931 Private Carrier Act (now C.R.S. '53, 115-11, as amended) was passed to coordinate motor vehicle transportation operations for hire or compensation upon the public highways of the state so that there would be no serious conflict between private carriers and common carriers. Highly pertinent sections of that act, as amended, are as follows:

" * * * It is hereby declared that the business of private carriers by motor vehicle * * * is *affected with a public interest* and that * * * the proper regulation of motor vehicle *common carriers* using such highways require the regulation of private carriers by motor vehicle * * * .

" * * * nor shall any such permit, *nor any extension or enlargement thereof,* be granted if the commission shall be of the opinion that the proposed operation of any such private carrier *will impair the efficient public service of any authorized motor vehicle common carrier or carriers* then adequately serving the same territory * * * . * * * No existing permit shall be transferred until the financial standing of the transferee is established to the satisfaction of the commission." C.R.S. '53, 115-11-3. (Emphasis supplied.)

"*Permit may be sold or transferred.* — Any permit issued by the commission or any rights obtained under such permit, held, owned or obtained by any private carrier by motor vehicle, may be sold, assigned, leased or incumbered only upon authorization by the commission." C.R.S. '53, 115-11-4.

" * * * Every private carrier is hereby forbidden, by discrimination or unfair competition, to destroy or impair the service or business of any motor vehicle common carrier or the integrity of the state's regulation of any such service or business; * * * " C.R.S. '53, 115-11-12.

It is a rule of statutory construction that to ascertain the legislative intent the court must consider the statute as a whole, and not look to isolated words and expressions. *Clark v. Fellin,* 126 Colo. 519, 251 P. (2d) 940. The flavor of the entire act is to protect common carrier operations. As was said in *McKay v. PUC,* supra, at p. 413:

"The legislative intent is clear, *that the authorization of private carriers shall not be detrimental,* within the limits of the law, to common-carrier operation. No permit as a private carrier can be granted by the commission if in its opinion, based upon proper evidence, such private-carrier operation impairs the efficient public service of an authorized common carrier serving the same territory or over the same highways or routes. *All this indicates an intent to coordinate motor transportation in such a way as to preserve common-carrier operation and to not impair the integrity of state regulation of common-carrier service.* * * * " (Emphasis supplied.)

Considering the history of motor vehicle carrier legislation in this state and the necessity for regulation in order to insure a coordinated transportation system in the interest of the public, we cannot conclude that the Legislature intended to prescribe the financial standing of the transferee as the sole criterion by which the Commission should determine whether to authorize a transfer. It is the public interest, not the relative interests of the transferor and transferee, that is of paramount importance in such matters and the public interest is not served if the effect of a transfer is to work economic devastation on common carriers. This precludes *financial standing* as the only subject of inquiry. Were it

otherwise, a transfer could result, as it would in this case but for the restriction, in an extension or enlargement of the authority to the detriment of the efficient public service of common carriers.

Moreover, C.R.S. '53, 115-11-24, states that:

*"Public utilities law applies.* — The provisions of articles 1 to 7 of this chapter and all acts amendatory thereof or supplemental thereto shall apply in so far as applicable to all private carriers by motor vehicle subject to the provisions of this article."

Articles 1 to 7 of Chapter 115 contain the general public utilities law of this state. By the terms of C.R.S. '53, 115-1-3 (as amended), a public utility is defined as:

" * * * and every corporation, or person now or hereafter declared by law *to be affected with a public interest,* and each thereof, is hereby declared to be a public utility and to be subject to the jurisdiction, control and regulation of the commission and to the provisions of articles 1 to 7 of this chapter. * * * " (Emphasis supplied.)

The Legislature has expressly declared that the business of private carriers by motor vehicle is affected with a public interest, C.R.S. '53, 115-11-3. Private carriers are, therefore, public utilities by legislative mandate. Their property is devoted to a public use to the extent that it cannot be used to engage in competition with common carriers in such a manner as would impair the efficient service of the latter.

Furthermore, this Court has said that the power of the Commission is based upon the doctrine of "regulated monopoly." *Ephraim Freightways, Inc., v. PUC,* 151 Colo. 596, 380 P. (2d) 228; *Denver & R.G.W. R.R. Co. v. PUC,* 142 Colo. 400, 351 P. (2d) 278. This doctrine is premised on the concept that the public interest is best served by restricting the number of competitors, rather than by permitting unlimited competition to prevail. Where a few may profit many may perish. No new or extended operations should be authorized which en-

danger or impair the operations of existing carriers contrary to the public interest, *PUC v. Donahue*, 138 Colo. 492, 335 P. (2d) 285, and it is clear that the Legislature intended "that the authorization of private carriers shall not be detrimental, within the limits of the law, to common-carrier operation." *McKay v. PUC*, supra.

To sum up, we think that the legislative scheme involved in the regulatory statutes clearly gives the Commission the power to consider the effect of a transfer of a private carrier authority on the operations of existing common carriers and to impose such *reasonable* restrictions as are necessary to conform the transfer to the public interest. Stanton and Kerr do not, in fact, contend that the restriction is unreasonable *per se*. Their contention is that the Commission has no authority to impose it. We point out that the restriction in question here is only that an operational headquarters be maintained at Craig, where Stanton has always maintained such an office. Stanton's operations are not being diminished by the imposition of the restriction in question. What is being affected by the restriction is the likelihood of unwarranted competition and resultant economic havoc and loss to existing common carriers in this state. Under the circumstances, we cannot say that the imposition of this restriction is unreasonable, arbitrary, or beyond the power conferred upon the Commission by the Legislature.

The record discloses that the Commission has many times in the past imposed restrictions on the transfer of private carrier permits so as to limit the operations of the transferee to those which were actually carried on by the transferor with a view towards safeguarding the public interest. While not controlling *per se*, the fact that there has been no legislative interference with this practice confirms the construction we have placed upon the governing statutes as against a doubt that might arise from a strained or narrow construction thereof. The contemporaneous construction of legislation and the

acquiescence of the Legislature in such construction bears an important function in determining the intent of the framers thereof. *Bowman v. Eldher,* 149 Colo. 551, 369 P. (2d) 977; *Beard-Laney, Inc., v. Darby,* 213 So. Car. 380, 49 S.E. (2d) 564; see also, *United States v. Midwest Oil Co.,* 236 U.S. 459, 59 L.Ed. 673, 35 S. Ct. 309.

Stanton and Kerr contend that placing restrictions on the transfer was improper because no notice was given to them before the hearing that the Commission contemplated such action. The contention is without merit. The record clearly shows that the issue of restrictions was raised and argued throughout the hearing before the Commission and that Stanton and Kerr were thoroughly aware of it and were not surprised by the introduction of evidence concerning the propriety of imposing the restriction. During the hearing, Stanton and Kerr's counsel argued the position they take here, that is, that the Commission had no power to concern itself with the prior extent of the use. Stanton and Kerr's counsel were offered the opportunity of a continuance if they wished to present or obtain further evidence of the prior use, but they did not see fit to accept this offer and proceeded to present their case on the very issue upon which they now contend that they received no notice. We find no prejudice to them in the manner in which the hearing was conducted.

For the reasons above expressed, the judgment is reversed and remanded with directions to affirm the order of the Commission.