The CITY AND COUNTY OF DENVER and Federico Peña, in his official capacity as Mayor of the City and County of Denver, Petitioners,

v.

John T. CASADOS, Jerry Draper, Roland Carter, and Augustine Villalobos, and all others similarly situated, Respondents.

No. 92SC195.

Supreme Court of Colorado,
En Banc.

Oct. 4, 1993.

Daniel E. Muse, City Atty., Darlene M. Ebert, Asst. City Atty., Denver, for petitioners.

John Mosby, Denver, Jennifer A. Payne, Longmont, for respondents.

Justice LOHR delivered the Opinion of the Court.

In *Casados v. City and County of Denver*, 832 P.2d 1048 (Colo.App.1992), the Colorado Court of Appeals held that the plaintiffs[1] stated a claim under the Fourth Amendment[2] that certain provisions of an Executive Order issued by the Mayor of the City and County of Denver are facially unconstitutional. We reverse and remand for further proceedings consistent with this opinion.

## I

On October 27, 1988, then Mayor Federico Peña of the City and County of Denver issued Executive Order No. 94 (the Order). Among other things, the Order implemented for non-law-enforcement purposes a mandatory blood- and urinalysis-drug-testing program for Denver employees. In April of 1990, the Denver District Court granted leave to the plaintiffs to file an amended class action complaint raising, among other issues, a facial challenge under the Fourth Amendment to the Order's provisions for alcohol and drug testing based on reasonable suspicion of alcohol or drug use or impairment.[3] The

---

1. The respondents in this class action are John T. Casados, Jerry Draper, Roland Carter, and Augustine Villalobos. They were the named plaintiffs in the district court proceedings, and because the issue of class certification has not yet been addressed, and is not before this court, we refer to them collectively as the plaintiffs.

2. In *Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), the United States Supreme Court held that the Fourth Amendment to the United States Constitution is enforceable against the states through the Due Process Clause of the Fourteenth Amendment. *Id.* at 27–28, 69 S.Ct. at 1361–1362. Strictly speaking, therefore, the issue before the court of appeals was whether the plaintiffs stated a claim under the Fourth Amendment as made enforceable against the states through the Due Process Clause of the Fourteenth Amendment.

3. The Order states in relevant part:

*Policy Overview*

. . . . .

The City ... has a vital interest in maintaining safe, healthful and efficient working conditions for its employees. Being under the influence of a drug or alcohol on the job may pose serious safety and health risks not only to the user but to all those who work with the user. The possession, use or sale of an illegal drug or use of alcohol in the workplace may

---

also pose unacceptable risks for safe, healthful and efficient operations.

. . . . .

*Policy Statement*

. . . . .

II. *ON–THE–JOB USE, POSSESSION OR SALE OF DRUGS OR ALCOHOL*
A. *Alcohol*
Being under the influence or impaired by alcohol by any employee while performing City business or while in a City facility is prohibited....

. . . . .

C. *Illegal Drugs*
The use, sale, purchase, transfer or possession of an illegal drug by any employee while in a City facility or while performing City business is prohibited....
*Policy Implementation*
III. *PROCEDURES FOR MANAGEMENT AND SUPERVISORS*
When a supervisor has reasonable suspicion that an employee is in violation of this policy the supervisor should immediately consult with an appropriate member of the in-house personnel staff or with the City Attorney's Office to determine further actions. However it is recognized that if the employee appears to be under the influence of drugs or alcohol, or alcohol or drugs are in his or her possession, immediate action may be required. Where this is the situation, the supervisor should do the following:
A. *Under the Influence of Alcohol*
The supervisor should confront the employee with the suspicion and order the employee to

defendants[4] responded with a motion to dismiss under C.R.C.P. 12(b)(5), and on June 25, 1990, the district court issued a two-sentence order stating:

> IT IS ORDERED, based upon the memorandum briefs submitted, that Defendants' Motion to Dismiss shall be and the same is hereby GRANTED.
>
> IT IS FURTHER ORDERED that a judgment of dismissal, with prejudice, be and the same is hereby entered in favor of the Defendants and against the Plaintiffs.

The plaintiffs appealed, and the court of appeals reversed. *See Casados,* 832 P.2d 1048. The court of appeals held that the plaintiffs did state a claim that the Order's provisions for drug testing based on reasonable suspicion of alcohol or drug use or impairment are facially invalid under the Fourth Amendment. *Id.* at 1052–54.[5] The court based this holding on the view that even if there is reasonable suspicion that a

government employee is under the influence of a drug or alcohol, or is using an illicit drug, it is unconstitutional for the government to require the employee to take a blood or urine test unless that employee works in a safety-sensitive position. *Id.* at 1053. Because the court construed the Order as covering all employees, *id.,* it remanded the case in order to give the plaintiffs an opportunity to prove the facts that would entitle them to relief, *id.* at 1053–54, specifically, that they do not hold safety-sensitive positions,[6] and that their other material allegations are true.

We granted certiorari to determine whether the court of appeals erred in its analysis of the plaintiffs' Fourth Amendment challenge to the facial constitutionality of the Order's provisions for reasonable suspicion testing. We do not agree that the plaintiffs have stated a claim under the Fourth Amendment that the Order's provisions for testing based on reasonable suspi-

the Occupational Health and Safety Center (day hours) or Denver General Psychiatric and Substance Abuse Emergency Room Service or the Denver Police Department DUI facilities for an evaluation. . . .

. . . .

**B.** *Use, Possession or Sale of Illicit Drugs*
When a supervisor has reasonable suspicion that an employee appears to be using illicit drugs while on duty the same procedures apply as when a supervisor has reasonable suspicion that an employee appears under the influence of alcohol.

. . . .

**C.** *Drug and Alcohol Screening*
Employees may be required to submit to blood, or urine or other alcohol or drug screening where there is reasonable suspicion of illicit use or the employee is under the influence of or impaired by alcohol or drug.

. . . .

**V.** *NON-COMPLIANCE BY THE EMPLOYEE*
. . . [N]oncompliance with the supervisor's order to be evaluated . . . will be viewed as refusal to obey the order of a supervisor and subject [sic] to discipline, which may include dismissal.
**VI.** *DISCIPLINARY ACTION*
Violation of this policy can result in a disciplinary action, up to and including dismissal, even for a first offense. . . .

**4.** Named as defendants were the City and County of Denver, Federico Peña in his official capacity as mayor of the City and County of Denver, the Department of Public Works, and William Roberts in his official capacity as head of

the City and County of Denver's Department of Public Works.

**5.** The defendants appended several affidavits to their Amended Brief in Support of Motion to Dismiss submitted to the district court, and the defendants argued before the court of appeals that the district court treated their motion to dismiss as a motion for summary judgment. *Cf.* C.R.C.P. 12(b) ("If, on a motion asserting the defense numbered (5) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment. . . .").

There is nothing, however, in the district court's June 25, 1990, order to suggest that it treated the defendants' motion as one for summary judgment. Furthermore, the court of appeals treated the defendants' motion as a C.R.C.P. 12(b)(5) motion to dismiss for failure to state a claim. *Casados,* 832 P.2d at 1053–54. We therefore do the same.

**6.** In the amended complaint, each plaintiff alleged that he was a classified employee of Denver, and that he was either suspended or terminated for refusal to take an alcohol or drug test, or terminated after taking and failing an alcohol test, pursuant to the alcohol- and drug-testing policy implemented by the Order. However, the amended complaint is silent on whether any or all of the plaintiffs held safety-sensitive positions.

cion of alcohol or drug use or impairment are facially invalid. However, the plaintiffs are entitled to pursue their as-applied constitutional challenges to the Order, as well as any remaining claims made by them in their amended complaint and asserted on appeal that were not addressed by the court of appeals.[7] Accordingly, we reverse and remand for further proceedings consistent with this opinion.

## II

Our analysis of the plaintiffs' facial challenge to the constitutionality of the Order is guided primarily by two recent decisions by the United States Court of Appeals, specifically, *American Federation of Government Employees, Local 2391 v. Martin,* 969 F.2d 788 (9th Cir.1992), and *National Treasury Employees Union v. Yeutter,* 918 F.2d 968 (D.C.Cir.1990). These decisions are in turn guided in significant part by three United States Supreme Court decisions, specifically, *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (upholding suspicionless blood and urine testing of railroad employees involved in certain types of train accidents, and breath and urine testing of railroad employees who supervisors have reasonable suspicion to believe are under the influence of a drug or alcohol), *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (upholding suspicionless urine testing of United States Customs Service employees seeking transfer or promotion to positions where they would be directly involved in the interdiction of illegal drugs, or would be required to carry firearms or to handle classified information that is truly sensitive), and *O'Connor v. Ortega,* 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (plurality opinion) (upholding investigatory search of public employee's office for evidence of work-related misfeasance based on supervisor's reasonable suspicion that such evidence would be found).

The Fourth Amendment protects individuals from unreasonable searches conducted by the government, even when the government acts as an employer. *Von Raab,* 489 U.S. at 665, 109 S.Ct. at 1390. Furthermore, the taking of a blood or urine sample by the government is deemed a search under the Fourth Amendment. *Skinner,* 489 U.S. at 616–17, 109 S.Ct. at 1412–13. Although a search must usually be supported by a warrant issued upon probable cause, *Von Raab,* 489 U.S. at 665, 109 S.Ct. at 1390, neither a warrant nor probable cause is an indispensable component of reasonableness in every circumstance. *Id.; Skinner,* 489 U.S. at 618–24, 109 S.Ct. at 1413–17. Rather, "[w]hat is reasonable ... 'depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself,'" *Skinner,* 489 U.S. at 619, 109 S.Ct. at 1414 (quoting *United States v. Montoya de Hernandez,* 473 U.S. 531, 537, 105 S.Ct. 3304, 3308, 87 L.Ed.2d 381 (1985)), and "the permissibility of a particular practice 'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests,'" *id.* (quoting *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979)).

Exceptions to the warrant and probable cause requirements may be permitted when "special needs, beyond the normal need for law enforcement," are involved. *Id.* 489 U.S. at 619, 109 S.Ct. at 1414. Such special needs are presented by the government's interest in "its operation of a government office." *Id.* at 620, 109 S.Ct. at 1415. *See also, Ortega,* 480 U.S. at 724–25, 107 S.Ct. at 1501–02 (recognizing "substantial government interests in the efficient and proper operation of the workplace"); *Yeutter,* 918 F.2d at 974 ("USDA's interest in efficient operations may justify departure from warrant and probable cause requirements" in certain circumstances.) When faced with such special needs, it is appro-

---

**7.** The court of appeals rejected the plaintiffs' claim that the Order is unconstitutionally vague and therefore violates their rights to due process of law under the Fourteenth Amendment to the United States Constitution and Article II, § 25, of the Colorado Constitution, *Casados,* 832 P.2d at 1050–52, and the plaintiffs did not seek certiorari review of those issues.

priate "to balance the governmental and privacy interests to assess the practicality of the warrant and probable-cause requirements in the particular context." *Skinner,* 489 U.S. at 619, 109 S.Ct. at 1414. After engaging in such a balancing, the court in *Yeutter* concluded that privacy concerns implicated by mandatory urinalysis did not outweigh the USDA's interest "in testing employees reasonably suspected of using drugs, or of being drug-impaired, while on duty." *Yeutter,* 918 F.2d at 975.

At issue in *Yeutter,* 918 F.2d 968, was the United States Department of Agriculture's (USDA's) Drug–Free Workplace Program implemented in response to Executive Order 12,564, which barred drug use by federal employees on and off duty, and which directed each executive agency to develop a plan for achieving a "drug-free workplace." *Id.* at 970. Under the USDA's program, all USDA employees, including USDA Food and Nutrition Service (FNS) employees, were subject to reasonable suspicion urinalysis-drug-testing. *Id.* at 972. If an FNS employee was suspected of on-duty or off-duty drug use, his or her supervisor would inform the FNS's Personnel Director, who would make a final determination of whether reasonable suspicion existed. *Id.* The court read *Skinner, Von Raab,* and *Ortega,* as well as two of its own previous decisions, as "suggest[ing] that, outside of the law enforcement context, the government's legitimate interest in employee drug testing extends no further than its interest in workplace conduct and performance of work responsibilities." *Id.* at 974. Recognizing also that the government has an interest in detecting and preventing off-duty drug use by those who hold safety- or security-sensitive jobs, *id.* at 974–75, the court held that the USDA program was unconstitutional only "insofar as it authorizes mandatory drug testing of FNS workers who do not hold safety- or security-sensitive jobs, absent reasonable suspicion of on-duty drug use or drug-impaired work performance," *id.; accord American Fed'n of Gov. Employees v. Derwinski,* 777 F.Supp. 1493, 1501 (N.D.Cal.1991). In other words, *Yeutter* holds that it *is* constitutional to subject *all* FNS employees to mandatory urine tests based on reasonable suspicion of *on-duty* drug use or impairment, but that it is *not* constitutional to subject employees who do *not* hold safety- or security-sensitive jobs to mandatory urine tests based only on reasonable suspicion of *off-duty* drug use or impairment.

At issue in *Local 2391,* 969 F.2d 788, was the United States Department of Labor's (DOL's) Drug–Free Workplace Program, also implemented in response to Executive Order 12,564. *Id.* at 789–90. The DOL's program distinguished between DOL employment positions determined to be public health and safety- or national security-sensitive, which it referred to as "testing designated positions" or "TDPs," and all other DOL employment positions. *Id.* at 790. Under the program, a urine test could be administered to any TDP employee based on reasonable suspicion of on-duty *or* off-duty drug use. *Id.* The court observed that although *Yeutter* held that employees who do *not* hold safety- or security-sensitive positions can only be tested based on a reasonable suspicion of *on-duty* drug use or impairment, *Yeutter* did not decide whether employees who *do* hold safety- and security-sensitive positions can be tested based only on a reasonable suspicion of *off-duty* drug use or impairment. *Id.* at 791. Relying primarily on *Skinner, Von Raab,* and *Ortega,* but also on several of its own previous decisions, the court in *Local 2391* held that it was *not* facially unconstitutional for the DOL's program to subject TDP employees to urine tests based only on reasonable suspicion of off-duty illegal drug use or impairment. *Id.* at 791–93. In so holding, the court emphasized the DOL's interest in preserving public health and safety, *id.* at 793, and that "the threshold requirement of reasonable suspicion minimizes the intrusion on the employees' privacy interests," *id.* The court also emphasized that its holding did not preclude an as-applied constitutional challenge to the program, *id.,* in the event, for example, that testing was ordered without rea-

sonable suspicion based on objectively reliable evidence, *see id.*[8]

■ The results in *Yeutter* and *Local 2391*, to the extent that they are relevant to the issue before us, accord with both precedent and reason. Accordingly, the Order's provisions for testing based on reasonable suspicion are facially invalid under the Fourth Amendment if they (A) provide for mandatory testing of employees who do *not* hold public safety- or security-sensitive positions, based only on reasonable suspicion of *off-duty* alcohol or drug use or impairment, or (B) provide for mandatory testing of employees who *do* hold public safety- or security-sensitive positions, based on *off-duty* alcohol or drug use or impairment, but with less than objectively established reasonable suspicion of such use or impairment.

### A

■ In determining whether the Order provides for mandatory testing of employees who do *not* hold public safety- or security-sensitive positions, based only on a reasonable suspicion of *off-duty* alcohol or drug use or impairment, we begin with the plain language of the Order. According to the Order, *see supra* note 3, an employee must be prepared to submit to an "evaluation" if a supervisor has reasonable suspicion that the employee "appears to be under the influence of drugs or alcohol," or if "a supervisor has reasonable suspicion that [the] employee appears to be using illicit drugs while on duty." In addition, employees must be prepared to submit to "blood, or urine or other alcohol or drug screening where there is reasonable suspicion of illicit use or the employee is under the influence of or impaired by alcohol or drug."

These provisions do not explicitly limit their application to employees who hold public safety- or security-sensitive positions, and some are not explicit with respect to whether they refer to on-duty or off-duty behavior, or both. In particular, the provision of the Order stating that an employee must be prepared to submit to "blood, or urine or other alcohol or drug screening where there is reasonable suspicion of illicit use" could be interpreted as authorizing mandatory blood- or urinalysis-drug-testing of employees who do *not* hold public safety- or security-sensitive positions, based only on a reasonable suspicion of *off-duty* behavior.

■ In addressing the plaintiffs' facial challenge to the constitutionality of the Order, however, it is appropriate that we presume that the Order is constitutional. *See National Treasury Employees Union v. Bush*, 891 F.2d 99, 101 (5th Cir.1989) ("A facial challenge to an Executive Order, like a facial challenge to legislation, 'is, of course, the most difficult challenge to mount successfully, since the challenge must establish that no set of circumstances exists under which the Act would be valid.'") (quoting *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987)); *Liberty Mut. Ins. Co. v. Friedman*, 485 F.Supp. 695, 716 (D.Md. 1979) (statutes and executive orders are entitled to a presumption of constitutionality), *rev'd on other grounds, Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164 (4th Cir.1981); *Colorado Dog Fanciers v. City and County of Denver*, 820 P.2d 644, 647 (Colo.1991) ("Legislation designed to protect the public's health and safety is entitled to a presumption of constitutionality."). Accordingly, we must adopt any reasonable and practical interpretation of the Order that renders it facially constitutional.

8. The court explained:
Reasonable suspicion drug testing of TDP employees is not random and unannounced. Rather, as the name suggests, such testing is based on objective evidence of on- or off-duty drug use. Furthermore, for purposes of testing for off-duty drug use ..., objective evidence must consist of credible eyewitness observations of illegal drug use or impairment. Finally, the Plan vests only minimal discre-

tion in the officials charged with implementing reasonable suspicion testing. Supervisors are trained to recognize facts giving rise to reasonable suspicion. They also must document all such facts and circumstances including dates and times of off-duty drug use or impairment as reported by reliable and credible sources before recommending a drug test. *Local 2391*, 969 F.2d at 793.

**914**

See *United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers,* 413 U.S. 548, 571, 93 S.Ct. 2880, 2893, 37 L.Ed.2d 796 (1973) ("our task is not to destroy [an] Act if we can, but to construe it, if consistent with the will of Congress, so as to comport with constitutional limitations"); *Renteria v. Colorado State Dep't of Personnel,* 811 P.2d 797, 799 (Colo.1991) ("whenever it is reasonable and practical, a statute must be construed in a manner consistent with constitutional requirements" and "when a statute is susceptible to both constitutional and unconstitutional interpretations, we must adopt the constitutional interpretation"). We therefore consider the Order as a whole, and not just particular sentences or phrases taken out of context, *see Humana, Inc. v. Board of Adjustment,* 189 Colo. 79, 82, 537 P.2d 741, 743 (1975) ("In construing a section of a legislative act, it is fundamental that the whole of the act must be read and considered in context."); *People ex rel. Dunbar v. Trinidad State Jr. College,* 184 Colo. 305, 309, 520 P.2d 736, 737–38 (1974) ("a fundamental principle of statutory construction [is] that the meaning of words used in a statute must be discerned by reading the entire statute"); *Public Utils. Comm'n v. Stanton Transp. Co.,* 153 Colo. 372, 377, 386 P.2d 590, 593 (1963) ("a rule of statutory construction [is] that to ascertain the legislative intent the court must consider the statute as a whole, and not look to isolated words and expressions"), in order to determine whether there is any reasonable and practical interpretation that renders the Order facially constitutional.

When viewed as a whole, it is evident that the Order focuses primarily on the detection and prevention of *on-duty* drug or alcohol use or impairment.[9] In addition, the Order also addresses concerns regarding *off-duty* alcohol and drug use by employees who hold public health- and safety-sensitive positions.[10] It is therefore unlikely that the provision of the Order stating that employees must be prepared to submit to "blood, or urine or other alcohol or drug screening where there is reasonable suspicion of illicit use"—or any other provision of the Order—contemplates blood- or urinalysis-drug-testing of employees who do *not* hold public safety- or security-sensitive positions, based only on reasonable suspicion of *off-duty* drug or alcohol use or impairment. More important, a reasonable and practical interpretation of the Order is that it does not.

**B**

In determining whether the Order provides for mandatory testing of employees who *do* hold public safety- or security-sensitive positions, based on *off-duty* alcohol or drug use or impairment, but with less than objectively established reasonable suspicion of such use or impairment, we likewise consider the plain language of the Order, taken in context, to determine whether there is any reasonable and prac-

9. For example, the "Policy Overview" section of the Order states:

Being under the influence of a drug or alcohol *on the job* may pose serious safety and health risks not only to the user but to all those who work with the user. The possession, use or sale of an illegal drug or use of alcohol *in the workplace* may also pose unacceptable risks for safe, healthful and efficient operations.

(Emphasis added.) In addition, part II of the Order prohibits use or impairment of employees "while performing City business or while in a City facility," and it is specifically entitled *"On–The–Job* Use, Possession or Sale of Drugs or Alcohol" (emphasis added).

10. For example, in its "Pre–Employment Screening" section, the Order provides that for "those positions where the public health and safety may be affected, the City may implement ... pre-employment screening practices designed to prevent hiring individuals who use illegal drugs or individuals whose use of legal drugs or alcohol indicates a potential for impaired or unsafe job performance."

In addition, the Order provides in its "Policy Overview" section that Denver's drug-testing program is designed, in part, to adhere to certain other laws and regulations that are attached as an appendix to the Order. These include a Denver Fire Department regulation according to which fire fighters are prohibited from using or possessing illegal drugs both on and off duty, and a Denver Police Department policy according to which the illegal use of any controlled substance under any circumstance is prohibited.

tical interpretation that renders it facially constitutional.

The Order provides:

> When a supervisor has *reasonable suspicion* that an employee is in violation of this policy the supervisor should immediately consult with an appropriate member of the in-house personnel staff or with the City Attorney's Office to determine further actions. However it is recognized that if the employee appears to be under the influence of drugs or alcohol, or alcohol or drugs are in his or her possession, immediate action may be required.

and:

> Employees may be required to submit to blood, or urine or other alcohol or drug screening where there is *reasonable suspicion* of illicit use or the employee is under the influence of or impaired by alcohol or drug.

(Emphasis added).

To the extent that the policy contained in the Order prohibits off-duty alcohol or drug use or impairment by employees who hold safety-sensitive positions, these two quoted provisions plainly state that it is only "reasonable suspicion" of such behavior that may trigger a drug test. To be sure, the Order does not contain as many explicit safeguards on how reasonable suspicion is to be determined by an employee's supervisors as the program examined by the court in *Local 2391*. *See supra* note 8. Neither, on the other hand, does the Order suggest that anything less than reasonable suspicion based on objective and credible evidence is sufficient. Because we prefer any reasonable and practical interpretation of the Order that renders it facially constitutional, *see supra* part IIA, we construe the Order as requiring reasonable suspicion established by objective and credible evidence to the extent that such suspicion may trigger a drug test of an employee for alleged on- or off-duty alcohol or drug use or impairment.

### III

For the foregoing reasons, the provisions of the Order that pertain to drug testing based on reasonable suspicion are not facially invalid under the Fourth Amendment, and the plaintiffs have failed to state a claim that they are, regardless of whether the plaintiffs hold safety-sensitive positions. Consequently, we reverse the judgment of the court of appeals and remand for further proceedings consistent with this opinion.

VOLLACK, J., dissents.

KIRSHBAUM, J., joins in the dissent.

Justice VOLLACK dissenting:

The majority holds that the plaintiffs in the present case have failed to state a claim "under the Fourth Amendment that the [drug testing policy provisions] for testing based on reasonable suspicion of alcohol or drug use or impairment are facially" unconstitutional. Maj. op. at 910–11. I disagree. I find that the decisions in *American Federation of Government Employees, Local 2391 v. Martin*, 969 F.2d 788 (9th Cir.1992), and *National Treasury Employees Union v. Yeutter*, 918 F.2d 968 (D.C.Cir.1990), do not provide a bright line rule with which to evaluate the City and County of Denver's drug testing policy. Rather, I find that *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), and *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), establish that courts must first ascertain whether there are special needs beyond the need for normal law enforcement before balancing government interests in drug testing against individuals' Fourth Amendment rights. I conclude that there are no special needs in this case, and that no interests need to be balanced. Were I to engage in such balancing, I would conclude that the drug testing policy is facially unconstitutional. I dissent.

## I.

The majority's analysis of the plaintiffs' facial challenge to the constitutionality of the drug testing policy "is guided primarily by two recent decisions by the United States Court of Appeals, specifically, *American Federation of Government Employees, Local 2391 v. Martin*, 969 F.2d 788 (9th Cir.1992), and *National Treasury Employees Union v. Yeutter*, 918 F.2d 968 (D.C.Cir.1990)." Maj. op. at 911. The majority notes that these two cases rely on *Skinner* and *Von Raab*. The majority finds that *Local 2391* and *Yeutter* provide the appropriate framework for determining whether drug testing policies contravene the Fourth Amendment to the United States Constitution. Maj. op. at 913. The majority concludes that, pursuant to *Local 2391* and *Yeutter*, drug testing policies are unconstitutional if they:

> (A) provide for mandatory testing of employees who do *not* hold public safety- or security-sensitive positions, based only on reasonable suspicion of *off-duty* alcohol or drug use or impairment, or (B) provide for mandatory testing of employees who *do* hold public safety- or security-sensitive positions, based on *off-duty* alcohol or drug use or impairment, but with less than objectively established reasonable suspicion of such use or impairment.

*Id.* *Yeutter* and *Local 2391*, however, neither establish such a bright line rule nor support the result reached by the majority.

## A.

### *The Yeutter Decision*

In *Yeutter*, the National Treasury Employees Union appealed a district court ruling that permitted the United States Department of Agriculture (USDA) "to proceed with random urinalysis drug testing of certain USDA motor vehicle operators and 'reasonable suspicion' drug testing of other Department workers." *Yeutter*, 918 F.2d at 969. The United States Court of Appeals affirmed the USDA's plan to test motor vehicle operators, but did not approve of that portion of the plan regarding

"reasonable suspicion" testing. *Id.* at 969–70.

The *Yeutter* court commenced its analysis by reviewing the United States Supreme Court decisions in *Skinner* and in *Von Raab*. The *Skinner* Court approved "post-accident drug testing of railroad employees and permitted testing after rules violations or minor accidents, and upon suspicion of on-duty impairment." *Yeutter*, 918 F.2d at 970. The *Yeutter* court observed that "the difficulty of detecting and deterring on-duty drug use through less intrusive means" was one of several important factors underlying the *Skinner* Court's analysis. *Id.* at 971. The *Von Raab* Court approved a drug testing plan "that mandated urinalysis of employees directly involved in drug interdiction and those required to carry firearms." *Yeutter*, 918 F.2d at 971. The *Yeutter* Court noted that the United States Supreme Court decisions in both *Skinner* and *Von Raab* followed the same analytic path wherein the public interest in drug testing was weighed against the reasonable privacy expectations of tested employees. *Id.*

With respect to motor vehicle operators, the *Yeutter* court relied on *American Federation of Government Employees v. Skinner*, 885 F.2d 884 (D.C.Cir.1989), *cert. denied*, 495 U.S. 923, 110 S.Ct. 1960, 109 L.Ed.2d 321 (1990), which held that safety interests and "strong national security concerns supported testing of these employees." *Yeutter*, 918 F.2d at 971. The *Yeutter* court balanced the reasonable privacy expectations of the motor vehicle operators against the government's safety interests, and concluded that the privacy expectations were outweighed. *Id.* at 972. In so concluding, the *Yeutter* court noted that "the Supreme Court 'has quite clearly eschewed an approach to drug testing based on bright lines.'" *Id.* (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 490 n. 9 (D.C.Cir.1989), *cert. denied*, 493 U.S. 1056, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990)).

With respect to the USDA's plan for drug testing of all Food and Nutrition Service (FNS) employees premised upon "reasonable suspicion," the *Yeutter* court reiterated that the validity of the drug testing

plan turns on a balancing of the intrusion on the individual's Fourth Amendment interests against promotion of legitimate government interests. *Yeutter*, 918 F.2d at 973. The *Yeutter* court concluded that any legitimate government interest did not extend farther than the workplace, and invalidated that part of the USDA's plan that permitted drug testing premised upon reasonable suspicion of off-duty drug use. In so concluding, the *Yeutter* court reiterated its holding in *Harmon*, wherein it stated that

"federal employment alone is not a sufficient predicate for mandatory urinalysis," and that "the government may search its employees only when a clear, direct nexus exists between the nature of the employee's duty and the nature of the feared violation."

*Yeutter*, 918 F.2d at 974 (quoting *Harmon*, 878 F.2d at 490).

The *Yeutter* court separately considered that portion of the USDA's plan which permitted drug testing based upon reasonable suspicion of on-duty drug use. The *Yeutter* court found that "mandatory urinalysis represents a substantial intrusion on employee privacy." *Id.* Thus, the *Yeutter* court rejected the government's "abortive suggestion that FNS' mission to advance human nutrition and protect the agricultural economy" outweighed the employees' privacy interest. *Id.* at 975. The *Yeutter* court concluded, without identifying any additional government interests, "that employee privacy concerns [did not] outweigh the government's interest in testing employees reasonably suspected of using drugs, or of being drug-impaired, while on duty." *Id.* at 975.

In summary, the *Yeutter* court did not apply a bright line test when evaluating the different portions of the drug testing plan at issue; rather, the *Yeutter* court conducted an analysis in each instance that involved a balancing of individual privacy interests against government interests in drug testing. The *Yeutter* court additionally emphasized the importance of finding "direct nexus" between the nature of an employee's job and the nature of the feared violation when evaluating the propriety of a drug testing plan.

## B.

### *The Local 2391 Decision*

In *Local 2391*, the United States Department of Labor (DOL) appealed from a district court order and argued that "the district court erred by holding that the Fourth Amendment bars drug testing of DOL employees *in public health and safety-sensitive or security-sensitive positions* based on reasonable suspicion of off-duty drug use." *Local 2391*, 969 F.2d at 789 (emphasis added). The United States Court of Appeals opinion in *Local 2391* was expressly limited to employees holding public health and safety-sensitive or security-sensitive positions. *Id.* at 790, 792.

At the outset of its analysis, the *Local 2391* court noted that *Yeutter* did not address whether employees holding safety- or security-sensitive positions could be tested on reasonable suspicion of off-duty drug use or impairment. The *Local 2391* court stated that "whether the government may validly require its employees to submit to drug testing is determined ' "by balancing its intrusion on the [employees'] Fourth Amendment interests against its promotion of legitimate government interests." ' " *Id.* at 791 (quoting *Skinner*, 489 U.S. at 619, 109 S.Ct. at 1414 (quoting *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979))). The *Local 2391* court stated that, "[w]here the government has a legitimate public health and safety or national security interest in confirming whether an employee is using illegal drugs on- or off-duty, the existence of reasonable suspicion weighs in favor of finding that a resulting search is reasonable." *Id.* at 792. The *Local 2391* court thus found the DOL's plan to be facially constitutional, but expressly reserved a determination of the plan's constitutionality as applied. *Id.* at 793.

## C.

### *Application of Yeutter and Local 2391 to the Present Case*

The majority states that "[t]he *results* in *Yeutter* and *Local 2391*, to the extent that they are relevant to the issue before us,

accord with both precedent and reason." Maj. op. at 913. The result reached in *Local 2391* is not relevant to the issue on which we granted certiorari insofar as the result reached in *Local 2391* is expressly limited to "employees holding clearly specified public health and safety- or national security-sensitive positions." *Local 2391*, 969 F.2d at 792. The result reached in *Yeutter*, insofar as it concerns "reasonable suspicion" testing, does not, in my opinion, accord with either precedent or reason because the *Yeutter* court did not articulate government interests when attempting to engage in "balancing." Further, the *Yeutter* court, after reiterating its previous holding, did not determine whether there was a "direct nexus" between *all* USDA employees and any feared violation.

I thus do not agree with the majority that the issue upon which we granted certiorari is resolved by examining whether the drug testing policy in the present case

> (A) provide[s] for mandatory testing of employees who do *not* hold public safety- or security-sensitive positions, based only on reasonable suspicion of *off-duty* alcohol or drug use or impairment, or (B) provide[s] for mandatory testing of employees who *do* hold public safety- or security-sensitive positions, based on *off-duty* alcohol or drug use or impairment, but with less than objectively established reasonable suspicion of such use or impairment.

Maj. op. at 913. Neither *Yeutter* nor *Local 2391* establishes such a bright line rule. Rather, both cases, in their *analytical sections relying on Skinner and on Von Raab*, dictate that this court balance government interests against individual employees' privacy concerns in determining whether the drug testing policy is facially constitutional. When balanced, the interests of the City and County of Denver do not outweigh individual employee Fourth Amendment interests.

## II.

### A.

#### *Fourth Amendment Analysis*

"[T]he Fourth Amendment protects individuals from unreasonable searches conducted by the Government, even when the Government acts as an employer...." *Von Raab*, 489 U.S. at 665, 109 S.Ct. at 1390 (relying on *O'Connor v. Ortega*, 480 U.S. 709, 717, 107 S.Ct. 1492, 1497, 94 L.Ed.2d 714 (1987)); *Skinner*, 489 U.S. at 613–16, 109 S.Ct. at 1410–13. "What is reasonable, of course, 'depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself.'" *Skinner*, 489 U.S. at 619, 109 S.Ct. at 1414 (quoting *United States v. Montoya de Hernandez*, 473 U.S. 531, 537, 105 S.Ct. 3304, 3308, 87 L.Ed.2d 381 (1985)). It is well settled that blood tests and urine tests constitute searches under the Fourth Amendment. *Skinner*, 489 U.S. at 616–17, 109 S.Ct. at 1412–13.

In criminal cases generally, "a search or seizure ... is not reasonable unless it is accomplished pursuant to a judicial warrant issued upon probable cause." *Id.* at 619, 109 S.Ct. at 1414 (relying on *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980)); *see Von Raab*, 489 U.S. at 665, 109 S.Ct. at 1390. The United States Supreme Court has "recognized exceptions to this rule, however, 'when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'" *Skinner*, 489 U.S. at 619, 109 S.Ct. at 1414 (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S.Ct. 3164, 3168, 97 L.Ed.2d 709 (1987)). Thus, when faced with special needs *beyond the normal need for law enforcement*, the United States Supreme Court "[has] not hesitated to balance the governmental and privacy interests to assess the practicality of the warrant and probable-cause requirements in the particular context." *Id.; see Von Raab*, 489 U.S. at 665, 109 S.Ct. at 1390.

### B.

#### *The United States Supreme Court Decisions*

In *Skinner*, the Railway Labor Executives' Association appealed from a determi-

nation upholding the Federal Railroad Administration's drug testing plan requiring employees to submit to blood and urine tests upon the occurrence of an accident or specified incident. *Skinner*, 489 U.S. at 612–13, 109 S.Ct. at 1410–11. The United States Supreme Court first found that the "Government's interest in regulating the conduct of railroad employees to ensure safety ... 'presents "special needs" beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements.'" *Skinner*, 489 U.S. at 620, 109 S.Ct. at 1414 (quoting *Griffin v. Wisconsin*, 483 U.S. at 873–74, 107 S.Ct. at 3168). The Supreme Court noted in *Skinner* that "[t]he problem of alcohol use on American railroads is as old as the industry itself, and efforts to deter it by carrier rules began at least a century ago," and that accidents involving alcohol or drug use from 1972 through 1983 "'resulted in 25 fatalities, 61 non-fatal injuries, and property damage estimated at $19 million.'" *Skinner*, 489 U.S. at 606–07, 109 S.Ct. at 1408 (quoting 48 Fed.Reg. 30726 (1983)).

After first making a finding of special needs, the Supreme Court reviewed the regulations at issue and found that the plan applied only to employees engaged in safety-sensitive tasks. *Id.* at 620, 109 S.Ct. at 1414. The Supreme Court found that the Government prescribed the plan in order " 'to prevent accidents and casualties in railroad operations that result from impairment of employees by alcohol or drugs.'" *Id.* at 620–21, 109 S.Ct. at 1415 (quoting 49 C.F.R. § 219.1(a) (1987)). Thus, the Supreme Court stated that the "governmental interest in ensuring the safety of the traveling public and of the employees themselves plainly justifies prohibiting covered employees from using alcohol or drugs on duty." *Id.* at 621, 109 S.Ct. at 1415. The Supreme Court then considered whether the governmental interests justified the privacy intrusions at issue. The Supreme Court engaged in extensive analysis of the Government's interests and the individual privacy concerns involved, and concluded that the Government's compelling interests in safety outweighed individual privacy concerns. *Id.* at 624–33, 109 S.Ct. at 1417–22.

In *Von Raab*, a union of federal employees appealed from a determination upholding the United States Customs Service (the Customs Service) drug testing program. *Von Raab*, 489 U.S. at 663–65, 109 S.Ct. at 1389–91. Under the plan, "[d]rug tests were made a condition of placement or employment for positions that [met] one or more of three criteria": direct involvement in drug interdiction, requirement that the employee carry a firearm, or requirement that the employee handle classified information. *Id.* at 660–61, 109 S.Ct. at 1387–88.

The Supreme Court noted at the outset that "[i]t is clear that the Customs Service's drug testing program is not designed to serve the ordinary needs of law enforcement." *Id.* at 666, 109 S.Ct. at 1391. The Supreme Court noted that "[t]he purposes of the program are to deter drug use among those eligible for promotion to sensitive positions within the Service." *Id.* The Supreme Court considered the Government's interests and the privacy interests of the employees seeking promotion to the covered positions.

The Supreme Court noted that "[t]he Customs Service is our Nation's first line of defense against one of the greatest problems affecting the health and welfare of our population." *Id.* at 668, 109 S.Ct. at 1392. The Supreme Court additionally stated that "the Government has a compelling interest in ensuring that the front-line interdiction personnel are physically fit, and have unimpeachable integrity and judgment," and that "the public should not bear the risk that employees who may suffer from impaired perception and judgment will be promoted to positions where they may need to employ deadly force." *Id.* at 670–71, 109 S.Ct. at 1393. The Supreme Court opined that the "national interest in self-protection could be irreparably damaged if those charged with safeguarding it were, because of their own drug use, unsympathetic to their mission of interdicting narcotics." *Id.* at 670, 109 S.Ct. at 1393.

The Supreme Court concluded that the possible harm against which the Customs

Service sought to guard was substantial, and that "the need to prevent its occurrence furnishes an ample justification for reasonable searches calculated to advance the Government's goal." *Id.* at 675, 109 S.Ct. at 1395. The Supreme Court, however, did not approve of that portion of the Customs Service's plan concerning employees who handle classified information. In assessing that category of employees, the Supreme Court stated that "[i]t is not clear ... whether the category defined by the Service's testing directive encompasses only those Customs employees likely to gain access to sensitive information." *Id.* at 678, 109 S.Ct. at 1397. The Supreme Court queried whether the Customs Service had defined the category more broadly than necessary in order to meet the stated purposes, and thus rejected that part of the drug testing plan. *Id.*

### C.

### *Fourth Amendment Analysis in the Present Case*

As the Court of Appeals noted in *Casados v. City and County of Denver,* 832 P.2d 1048 (Colo.App.1992), the drug testing plan requires employees to submit to blood or urine tests "where there is reasonable suspicion of illicit use or the employee is under the influence of or impaired by alcohol or drug." *See id.* at 1050. The drug testing policy thus condones conduct that constitutes a search under the Fourth Amendment.

Under *Skinner* and *Von Raab,* such searches may be reasonable if the "Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement." *Von Raab,* 489 U.S. at 665, 109 S.Ct. at 1390–91. The drug testing policy states as follows:

As an employer, the City is required to adhere to various federal, state and local laws and regulations regarding alcohol or drug abuse....

The City also has a vital interest in maintaining safe, healthful and efficient working conditions for its employees. Being under the influence of a drug or alcohol on the job may pose serious safe-

ty and health risks not only to the user but to all those who work with the user. Other than compliance with regulations and an interest in maintaining a safe work environment, the drug testing policy does not contain any additional justifications for drug testing. In fact, the drug testing policy states that, "[w]hen a supervisor has reasonable suspicion that an employee appears to be in possession of or selling or transferring illicit drugs, the police are to be contacted." The drug testing policy evinces, by its plain language, an intent to comply with laws which, in my opinion, is best served by normal law enforcement. Thus, under *Skinner* and *Von Raab,* we need not balance government interests against privacy interests because there is no special need for drug testing beyond normal law enforcement expressed in the drug testing policy. Accordingly, the blood and urine searches authorized by the policy amount to an impermissible, unreasonable search under the Fourth Amendment.

Were I to engage in balancing, however, I would find the government's interest in maintaining a safe work environment does not justify the privacy intrusions at issue. Government interest in the safety of a workplace has been recognized as being reasonable. The drug testing policy is not limited to employees holding safety- or security-sensitive positions. The City and County of Denver, as a governmental unit, does not serve a specialized function such as the interdiction of illegal narcotics which, by its nature, involves safety- or security-sensitive functions. There is no direct nexus between *all* positions held by City and County of Denver employees and an unasserted, feared violation. Without more, I would not find that the interest in a safe work environment alone justifies the substantial intrusions into all City and County of Denver employees' rights to bodily integrity occasioned by blood and urine testing. *See Bolden v. Southeastern Pennsylvania Transp. Auth.,* 953 F.2d 807 (3d Cir.1991) (holding that drug testing plan was unconstitutional because the plan subjected a maintenance custodian to suspicionless testing, where no showing that employees' position involved any unusual degree of danger or that there were inju-

ries to maintenance custodians generally); *American Fed'n of Gov't Employees, AFL–CIO, Council 33 v. Thornburgh,* 720 F.Supp. 154 (N.D.Cal.1989) (entering a preliminary injunction to enjoin enforcement of a drug testing scheme requiring testing of *all* employees of the Federal Bureau of Prisons, regardless of job function and in light of the fact that no evidence was provided demonstrating a special need for indiscriminate testing); *Bangert v. Hodel,* 705 F.Supp. 643 (D.D.C.1989) (entering an injunction enjoining random urinalysis testing of United States Department of the Interior employees that held routine job classifications, such as mail and file clerks).

Based on the foregoing, I dissent.

I am authorized to say that Justice KIRSHBAUM joins in this dissent.